**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                            )
PACIFIC SOLAR ENERGY, S.A., de C.V.,        )
a Honduran company,                         )
                                            )
                Plaintiff,                  )
                                            )
        v.                                  )
                                            )
UNITED STATES DEPARTMENT OF                 )   Civil Action No. 18-cv-00048 (RDM)
THE TREASURY, ACTING DIRECTOR               )
OF THE OFFICE OF FOREIGN ASSETS             )
CONTROL, OFFICE OF FOREIGN                  )
ASSETS CONTROL, and SECRETARY               )
OF THE TREASURY,                            )
                                            )
                Defendants.                 )
_____)

**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

The question in this case is a simple one: did the Foreign Narcotics Kingpin Designation Act ("Kingpin Act") *require* Defendants to grant Plaintiff a license to release funds blocked pursuant to the Act. The answer is clearly no. In the Government's motion for summary judgment and opposition to Plaintiff's motion, the Government explained that while the statute grants broad discretion to the Office of Foreign Assets Control ("OFAC") to issue licenses to release funds blocked by the statute, nothing in the Act prescribes how the agency should exercise this discretion. *See* Defs.' Mot. for Summ. J. and Opp. to Pl.'s Cross-Mot. for Summ. J. ("Defs. MSJ") at 14-15, ECF No. 61. In response, Plaintiff's Reply continues to press its argument that a single statement in the legislative history concerning the impact of the statute on *Americans* requires OFAC to grant it a license. *See* Pl.'s Reply and Cross-Opp. to Defs.' Mot. for Summ. J. (Pl.'s Reply) at 9, ECF No. 64. The Government has shown that Plaintiff's interpretation of the legislative history is unpersuasive. Moreover, Plaintiff is a *Honduran*

1

company and therefore the statement in the legislative history concerning Americans has no relevance to its lawsuit. Moreover, even if there were a conflict between the statutory language and the Act's legislative history, the former clearly controls. Plaintiff's argument turns this basic canon of statutory construction on its head and is easily rejected.

OFAC policy is to grant licenses in rare cases, and generally only for national security and foreign policy reasons, neither of which applied here. This policy—which is premised on avoiding the dissipation of blocked assets— furthers the purposes of the Kingpin Act by maximizing leverage over narcotics traffickers. *See* Defs. MSJ at 12-13. According to Plaintiff, however, the President cannot use blocked assets as leverage over sanctioned drug traffickers because our Government supposedly cannot enter into agreements with such entities. There is no reason to think that is the case. Indeed, Plaintiff's argument ignores that our Government used the blocked assets of Columbian cartels as a bargaining chip in a successful negotiation with family members of the cartels. *Id*. In addition, preserving blocked assets against dissipation creates a powerful incentive for a sanctions target to cease its activities in order to be "delisted" and have OFAC unblock its assets. Because OFAC's 2016 denial of Plaintiff's request for a license was made pursuant to this lawful policy, and because the Kingpin Act does not mandate that OFAC grant a license to a foreign business such as Plaintiff, the agency's decision was lawful and was not arbitrary and capricious.

In addition, the fact that Plaintiff's funds were made available for payment in Honduras provides an alternative rationale for upholding the agency's license denial. However, the Court need not reach the question of where Plaintiff's funds are located. Instead, so long as the Court agrees with the Government's position that the Act does not require OFAC to grant licenses to applicants such as Plaintiff, it should award summary judgment to the Government on that basis

2

alone with respect to Plaintiff's statutory, APA and declaratory judgment claims in Count I-III of the Complaint. *See* Compl., Counts I & III (alleging OFAC's actions are contrary to the Kingpin Act, in violation of the APA); Count II (seeking declaratory judgment to this effect), ECF No. 1; *see also Pl.*'s Mot. for Summ. J. or in the Alternative for Remand of Special License App. For Readjudication, ("Pl. Mot.") at 12-20, ECF No. 60.

Plaintiff's Reply makes clear that its due process claim in Count IV of the Complaint is based on the same flawed argument underlying its statutory and APA claims: namely, that the Kingpin Act supposedly requires OFAC to grant it a license based on its representations of "innocence." Pl.'s Reply at 11. The Government has demonstrated that this is not the case. OFAC provided Plaintiff with meaningful process and, as a result, the Government is entitled to summary judgment with respect to this claim.

For the reasons previously set forth by the Government and further detailed below, and based on the previously filed Administrative Record ("AR"), ECF No. 29-1, Addendum to Administrative Record ("Addendum to AR"), ECF No. 44-1, and Declaration of Alexandre Manfull, OFAC's Assistant Director for Sanctions Compliance and Evaluation ("Manfull Decl."), ECF No. 45-1),[1] this Court should award summary judgment to the Government on all claims in Plaintiff's Complaint.

---

[1] Defendants files this declaration "to provide the court with background information" about OFAC's implementation of the Kingpin Act and its licensing decision here. *See Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 1996); *Camp v. Pitts*, 411 U.S. 138, 141-43 (1973). OFAC routinely submits such background declarations in suits challenging OFAC actions. *See, e.g.*, *Islamic Am. Relief Agency v. Unidentified FBI Agent*, 394 F. Supp. 2d 34 (D.D.C. 2005).

**ARGUMENT**

I.   **OFAC'S DENIAL OF PLAINTIFF'S REQUEST FOR A LICENSE TO UNBLOCK FUNDS WAS NOT ARBITRAY AND CAPRICIOUS OR CONTRARY TO THE KINGPIN ACT.**

This case arises out an attempt by Plaintiff to make a premium payment to its Honduran insurance company, which maintained an account at the Honduran bank, Banco Continental. Specifically, on October 7, 2015, Plaintiff's U.S.-based bank sent a wire transfer of $105,028.05 to U.S. Century Bank, which then placed the dollars into Banco Continental's correspondent account at U.S. Century in Miami. Defs. MSJ at 6-7. Doing so caused an automated SWIFT MT-103 message to be sent from U.S. Century to Banco Continental in Honduras, notifying it of the receipt of the funds at U.S. Century and instructing Banco Continental to credit the account of Plaintiff's insurance company at Banco Continental in Honduras. *See* Defs. MSJ at 20-21.

However, several hours *before* Plaintiff's wire transfer was initiated, OFAC had announced the designation of Banco Continental as a Specially Designated Narcotics Trafficker (SDN) for playing an integral role in the money laundering operations of international narcotics traffickers. Defs. MSJ. at 6. As a result, U.S. Century ultimately blocked the funds in Banco Continental's correspondent account in Miami. But not, as explained above, before crediting Banco Continental's correspondent account for the amount of Plaintiff's transfer, and sending the MT-103 to Banco Continental, which OFAC has determined transferred Plaintiff's funds from the U.S. to Honduras. *See infra*. As a further consequence of this designation, the Honduran Government ordered Banco Continental to cease operating, which prevented the bank from crediting the account of Plaintiff's insurance company in Honduras. Defs. MSJ. at 6. The bank has now been placed in liquidation by the Honduran Government, and numerous creditors are pursuing claims against the bank. *Id*.

In 2016, Plaintiff applied for a special license to release the $105,000 blocked at U.S. Century in Miami — which it represented were its own funds — and in response, OFAC denied the application.[2]  Defs. MSJ at 8.  Plaintiff's Complaint contends that OFAC's denial of its license in March 2016, and the agency's denial of its request for reconsideration in November 2016, is contrary to the Kingpin Act, is arbitrary and capricious in violation of the APA, and seeks a declaratory judgment to this effect.  *See* Compl., Counts I-III.  According to Plaintiff, the statute requires OFAC to grant licenses to entities such as itself without ties to drug trafficking based on a statement in the Act's legislative history.  *See* Pl. Mot. at 12-20; Pl. Reply at 8-11.  As set forth below, Plaintiff is mistaken.  The agency denied Plaintiff's license application pursuant to a policy that is fully consistent with the purposes of the Kingpin Act.  Accordingly, this denial was proper and was not arbitrary and capricious.[3]

### A. The Kingpin Act Does Not Require OFAC To Grant Special Licenses To Applicants Without Ties To Drug Trafficking.

The Kingpin Act blocks all "property and interests in property within the United States" owned or controlled by a SDN.  21 U.S.C. § 1904(b).  It further prohibits "[a]ny transaction or dealing by a United States person in property or interests in property of any significant foreign narcotics trafficker."  *Id*. § 1904(c)(1).  Plaintiff's Reply acknowledges that, in light of

---

[2] As discussed below, these funds belong to Banco Continental.  Plaintiff's funds, in contrast, were made available for payment in Honduras.

[3] The standard of review here under the APA is a "narrow one."  *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).  "[I]f OFAC's actions were not arbitrary and capricious and were based on substantial evidence, the Court must uphold OFAC's decision."  *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003).

§ 1904(c)(1), the dollars at U.S. Century Bank in Miami are blocked by operation of the statute itself. Pl's Reply at 8-9. While Plaintiff notes that the statutory requirement to block transactions applies "[e]xcept to the extent provided in regulations, orders, instructions, licenses, or directives issues pursuant to this chapter," *id*. at 9 (citing 21 U.S.C. § 1904(c)(1)), this language does not help Plaintiff's case, but undermines it. It demonstrates that Congress granted the Treasury Department, acting through OFAC here, broad discretion to implement the Act. The statutory language does not impose *any* requirements on how OFAC is to exercise this discretion, must less mandate that OFAC grant licenses to applicants without ties to drug trafficking. The clear design of the Kingpin Act, then, is to impose broad blocking prohibitions as a default while granting OFAC discretion to create regulatory exceptions to these restrictions in light of the purposes of the Act.

In the face of this plain language, Plaintiff once again effectively tries to rewrite the statute by citing to a statement in the House Conference Report that "[t]here is no intention that this legislation affect Americans who are not knowingly and willfully engaged in international narcotics trafficking." Pl. Reply at 9 (citing H.R. Rep. No. 106-457, at 42 (Conf. Rep.), reprinted in 1999 U.S.C.C.A.N. 304, 313). Plaintiff, however, is a Honduran company and there is no evidence in the legislative history that Congress was concerned about the impact of the statute on foreign companies. Thus, the legislative history is of no benefit to Plaintiff.

Moreover, Congress was aware that Americans without connections to drug trafficking would be "affected" by the Act. *See* Defs. MSJ at 15. The House Conference Report states that the Kingpin Act was modeled after the successful use of the International Emergency Economic Powers Act ("IEEPA") against Colombian narcotics traffickers, and those actions blocked the assets of numerous businesses, which necessarily impacted Americans engaged in commercial

transactions with those businesses. *See* H.R. Rep. No. 106-457, at 42-43, 46-47; *see also* Manfull Decl. ¶ 10. Therefore, Congress was clearly aware that the Kingpin Act, like any sanctions regime, would undoubtedly "affect" Americans without knowing or willful ties to drug trafficking. As a result, the statement in the House Conference Report relied upon by Plaintiff is most reasonably interpreted to mean that Congress did not intend for the Government to wield its sanctioning power against Americans. *See* Defs. MSJ at 15. This interpretation is consistent with the statute's grant of authority to Treasury to designate only "foreign persons" as SDNs. *See* 21 U.S.C. § 1904.

Plaintiff disagrees and points to the establishment in the Act of a Judicial Review Commission on Foreign Asset Control ("Commission"). Pl. Reply at 10 (citing 21 U.S.C. § 1908(c)(2)). The statute required the Commission to "conduct a detailed examination and evaluation of the remedies available to United States persons affected by the blocking of assets of foreign persons . . . ." 21 U.S.C. § 1908(c)(2)). While this language evidences a concern with the rights of United States persons, the existence of such a concern is a strong indication that Congress understood that Americans would be impacted by the Kingpin Act given the scope of the Act. Furthermore, Congress has not altered or amended the Kingpin Act in any relevant way in response to the Commission's report and has not expressed disapproval of OFAC's licensing regime.

There is no basis to conclude that Congress included a mandatory requirement in the Kingpin Act to grant licenses to Americans without knowing ties to drug trafficking, but simply failed to say anything about this requirement in the actual text of the statute. Congress could have prohibited only "any transaction or dealing by a United States person who has willfully and knowingly engaged in international narcotics trafficking." Instead, it extended the reach of the

statute more broadly and prohibited "[a]ny transaction or dealing by a United States person, or within the United States." 21 U.S.C. § 1904(c). Congress could also have stated that the Treasury Department was required to grant licenses to Americans without knowing ties to drug trafficking. But it did not do so and imposed no restrictions whatsoever in the statutory language on the exercise of Treasury's broad discretion. *See id*.

This Court must give effect to the actual language enacted by Congress, *Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004) (if the text evinces "a plain, nonabsurd meaning," court should not "read an absent word into the statute"); *Bates v. United States*, 522 U.S. 23, 29 (1997) (courts ordinarily should "resist reading words or elements into a statute that do not appear on its face"), and reject Plaintiff's attempt to allow ambiguous legislative history to trump the plain text of the statute. *See United States v. Gonzales*, 520 U.S. 1, 6 (1997) ("Given the straightforward statutory command, there is no reason to resort to legislative history."); *Shannon v. U.S.*, 512 U.S. 573, 583 (1994) ("We are not aware of any case . . . in which we have given authoritative weight to a single passage of legislative history that is in no way anchored in the text of the statute.").

Moreover, to the extent the legislative history somehow renders the otherwise plain text of the statute ambiguous (it does not), the Court should defer to OFAC's reasonable interpretation of the statute. *See* Defs. MSJ at 17. In addition to the deference accorded to agency action under the APA, the D.C. Circuit has explained that an even more deferential level of review applies when matters of foreign policy and national security are concerned. *See Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007) ("we reiterate that our review—in an area at the intersection of national security, foreign policy, and administrative law—is extremely deferential"); *Zarmach Oil Servs., Inc. v. Dep't of Treasury*, 750 F. Supp. 2d

150, 155 (D.D.C. 2010) ("courts owe a substantial measure of deference to the political branches in matters of foreign policy, including cases involving blocking orders") (citation omitted)); *see also Paradissiotis v. Rubin*, 171 F.3d 983, 988 (5th Cir. 1999) (blocking involves "foreign policy and national security"); *Havana Club Holding, S.A. v. Galleon S.A.*, 961 F. Supp. 498, 504 (S.D.N.Y. 1997) ("OFAC's actions" with respect to blocking of Cuban assets under TWEA "rest upon sensitive foreign policy concerns").

Plaintiff's argument is contrary to the plain language and structure of the Kingpin Act. Moreover, the legislative history relied upon by Plaintiff does not suggest any concern with the impact of the Act on foreign companies. The Kingpin Act did not require OFAC to grant Plaintiff a license. As seen below, OFAC denied Plaintiff's license pursuant to a lawful policy that is consistent with the Act's purposes.

### B. OFAC Denied Plaintiff's License Application Pursuant to a Lawful Policy That Furthers The Purposes of the Kingpin Act.

OFAC grants special licenses to unblock funds in rare cases, and generally only for national security and foreign policy reasons. Defs. MSJ at 6, 12. OFAC concluded that granting a license to Plaintiff would be inconsistent with this policy, which is designed to preserve funds in order to maximize the Executive's leverage over designated drug traffickers. *Id*.

Plaintiff asserts that OFAC's policy is contrary to the purposes of the Kingpin Act, and hence unlawful, based on its contention that our Government cannot enter into agreements with narcotics traffickers. Pl. Reply at 14. That is incorrect. Indeed, Plaintiff has no response to the Government's showing that this Nation has already used the blocked assets of drug traffickers as leverage in prior negotiations. In Defendants' opening motion, we explained that our Government used the possibility of lifting IEEPA blocking orders freezing the assets of Colombian cartel members as a bargaining chip to obtain the cooperation of relatives of the

Cartel leaders. Defs. MSJ at 12-13. This clearly promoted the broad goals of the statute, which are not limited, as Plaintiff suggests, to merely bankrupting and disabling sanctions targets. Pl. Reply at 13. Instead, Congress expressly stated the purposes of the Kingpin Act are to protect "the national security, foreign policy, and economy of the United States" from the congressionally declared national emergency created by international drug trafficking. 21 U.S.C. § 1901(a)(4). So long as OFAC's licensing policy is consistent with these broad purposes, it is lawful.

OFAC's licensing policy is also designed to impact the behavior of sanctions targets in a manner that promotes the goals of the Act. While Plaintiff recognizes that OFAC's licensing policy contemplates that assets will remain blocked until the sanctions target is no longer listed as a SDN, Pl. Reply at 12, it fails to recognize the incentive this creates for a narcotics trafficker to cease its conduct in order to be "delisted" from the SDN list and, as a result, have OFAC unblock the entity's assets. *See* Manfull Decl. ¶ 29; *see* 31 CFR § 501.807 (explaining that blocked person, including a specially designated narcotics trafficker, may seek to have a "designation rescinded" by OFAC by "propos[ing] remedial steps on the person's part . . . which the person believes would negate the basis for designation"). If OFAC were required to grant licenses to third parties with interests in blocked assets who are not themselves involved in drug trafficking, these assets could rapidly become dissipated and the incentive for sanctions targets to reform their conduct would be lessened, not strengthened —a result that is manifestly contrary to the broad goals of the Kingpin Act to protect the national security, foreign policy and economy of the United States from the emergency caused by international narcotics trafficking. *See* 21 U.S.C. § 1901(a)(4).

The Supreme Court has endorsed OFAC's policy with respect to assets blocked under the IEEPA. In *Dames & Moore v. Regan*, the Supreme Court stated "that the congressional purpose in authorizing blocking orders is 'to put control of foreign assets in the hands of the President,'" and that "[s]uch orders permit the President to maintain the foreign assets at his disposal for use in negotiating the resolution of a declared national emergency." 453 U.S. 654, 673 (1981) (quoting *Propper v. Clark*, 337 U.S. 472, 493 (1949)). In addition, the Court stressed that the ability of the Executive to use frozen assets as a "bargaining chip" in future negotiations would be threatened if third parties could seek the release of such funds. *Id*. ("[I]t is difficult to accept petitioner's argument because the practical effect of it is to allow individual claimants throughout the country to minimize or wholly eliminate this 'bargaining chip' through attachments, garnishments, or similar encumbrances on property.").

The fact that the materially equivalent licensing policy challenged here was upheld by the Supreme Court in *Dames & Moore* further confirms the validity of the Government's position. Plaintiff attempts to distinguish the case by claiming that the rationale of maximizing Presidential leverage only makes sense in the IEEPA context because there the United States may enter into bilateral agreements with other nations.[4] Pl. Reply at 14. Plaintiff is wrong that IEEPA is limited to blocking actions against foreign governments. Instead, just like the Kingpin

---

[4] Plaintiff notes that Judge Cooke agreed with its argument in *World Fuel Corp. v. Paulson*, Case No. 1:07-CV-20398-MGC (S.D. Fla. Mar. 31, 2008) (Cooke, J.). Pl. Reply at 11-12. The Government acknowledges this fact, but has already explained at length why this decision was mistaken and why it has no precedential impact here. *See* Defs. MSJ at 18-20. Plaintiff argues in its reply that this decision has preclusive effect under the collateral estoppel doctrine. Pl. Reply at 11 n.6. The Supreme Court has rejected this position and does not allow the use of so-called nonmutual collateral estoppel against the federal government. *See United States v. Mendoza*, 464 U.S. 154, 158-62 (1984) (private party in litigation against the federal government may not collaterally estop government based on decision in prior case against the government involving a different party).

Act, IEEPA is routinely used to block the assets of numerous foreign businesses and individuals.[5] Plaintiff's argument also flies in the face of the reality that Congress expressly modeled the Kingpin Act based on the successful use of IEEPA against Colombian cartels. Defs. MSJ at 13-14. As noted, our Government used those assets as a "bargaining chip" to enter into negotiations with family members of the Cartel leaders. *See supra*. Therefore, Plaintiff's claim that the IEEPA does not serve as a relevant precedent, or that leverage is not a legitimate consideration under the Kingpin Act, is groundless.

Plaintiff additionally argues that even if OFAC's licensing policy furthers the purposes of the Kingpin Act as a general matter, it does not do so in this particular case because the blocked assets allegedly belong to it, not the SDN (i.e., Banco Continental). Pl. Reply at 15-16. The Government has demonstrated at length that OFAC's licensing policy furthers the goals of the Kingpin Act, and that nothing in the statute requires OFAC to create an exception to this legitimate policy for Plaintiff. *See supra*. Plaintiff's argument essentially boils down to the claim that OFAC has no business blocking assets purportedly "owned" by entities who are not themselves SDNs. *See* Pl. Reply at 15-16. This position is premised both on a misunderstanding of the facts of this case, *see infra* (explaining that Banco Continental owns the dollars in its correspondent account in Miami), and also ignores the broad scope of the Kingpin Act. The statute does not simply block property over which a SDN has clear title. It prohibits "any" transaction by a U.S. person "in property or *interests* in property" of a SDN. 21 U.S.C. § 1904(c) (emphasis added). The Secretary has issued regulations implementing the Kingpin Act. *See* 31 C.F.R. part 598. Those regulations define "property" very broadly to include, among

---

[5] *See, e.g.*, https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20180323.aspx; https://home.treasury.gov/news/press-releases/sm0298.

other things, bank deposits, savings accounts, contracts, and other property, real, personal, or mixed, tangible or intangible, or interest or interests therein. *See id*. § 598.312. The regulations also define the term "interest" to include a property interest "of any nature whatsoever . . . whether present, future or contingent." *Id*.

As this makes clear, the fact that Plaintiff may have a potential legal claim against Banco Continental's funds at U.S. Century does not change the reality that those funds are properly blocked under the statute. Plaintiff's argument to the contrary amounts to a dispute with Congress, which determined that the Kingpin Act should reach the funds currently blocked in Miami. *See* 21 U.S.C. § 1904(c) (prohibiting any transaction by a U.S. person "in property or *interests* in property" of a SDN) (emphasis added).

Plaintiff is understandably frustrated that it tried to send a premium payment hours after OFAC announced the designation of Banco Continental as a SDN. But Plaintiff's disagreement with OFAC's licensing policy does not translate into a legal claim that OFAC has violated the law. Because OFAC's denial of Plaintiff's license application was made pursuant to a lawful policy that directly furthers the purposes of the Act, it was not contrary to law or arbitrary and capricious. Accordingly, the Government should be awarded summary judgment on Plaintiff's statutory, APA and declaratory judgment claims in Count I-III of the Complaint. *See* Compl., Counts I & III (alleging OFAC's actions are contrary to the Kingpin Act, in violation of the APA); Count II (seeking declaratory judgment to this effect).

### C. OFAC's Determination That Plaintiff's Funds Are Located In Honduras Was Not Arbitrary and Capricious.

The Government's 2016 denial of Plaintiff's license application was based on OFAC's understanding that Plaintiff's own funds were blocked at U.S. Century Bank in Miami. However, after the filing of Plaintiff's Complaint, U.S. Century provided OFAC with the SWIFT

13

MT-103 payment order that it sent to Banco Continental in October 2015.  See Defs. MSJ at 20-21.  Based on this new information, OFAC responded to Plaintiff on August 3, 2017, with an additional rationale for denying its license application: namely, that Plaintiff's funds had been made available for payment in Honduras.  Addendum to AR at 155.  OFAC explained that Plaintiff did not need a license to access these funds, as OFAC's jurisdiction does not extend to funds outside the United States that are not controlled by a U.S. person.  *Id*.

If the Court agrees with OFAC that the Kingpin Act does not require it to grant a license to Plaintiff —which is the sole basis upon which Plaintiff seeks relief —then it must grant summary judgment to the Government and need not reach the question of where Plaintiff's funds are located.  Indeed, both parties agree that this question does not impact the Court's ability to redress Plaintiff's injury.  *See* Defs. MSJ at 3; Pl. Mot. at 7.  In the unlikely event, however, the Court were to inclined to find that the Kingpin Act requires OFAC to grant licenses to foreign companies without knowing ties to drug trafficking, it should uphold OFAC's denial of Plaintiff's license request based on the agency's determination that Plaintiff's funds are located in Honduras.  The Government's motion has explained at length why OFAC's determination regarding the location of Plaintiff's funds is supported by the administrative record (in particular the MT-103), Addendum to AR at 155-57, and is not arbitrary and capricious.  Defs. MSJ at 20-24; Addendum to AR.

In response, Plaintiff's reply continues to argue that Banco Continental's account was blocked before its wire transfer was sent and that its funds could not have been placed into Banco Continental's correspondent account at U.S. Century.[6]  Pl. Reply at 3.  It is not clear how

---

[6] Plaintiff's arguments in its reply are based largely on the extra-record deposition testimony of a U.S. Century employee.  *See* Pl. Reply at 2-8.  Under general principles of administrative law, this Court reviews OFAC's decision based solely on the record before the agency at the time of

this argument directly responds to OFAC's determination that Plaintiff's funds were made available for payment in Honduras given that there is no dispute that U.S. Century sent the MT-103 to Banco Continental in Honduras. Defs. MSJ at 20-24. Moreover, the MT-103 would not have been sent by U.S. Century to Banco Continental *unless* the wire transfer had been placed into Banco Continental's correspondent account. Manfull Decl. ¶ 47. This should be sufficient to establish the reasonableness of the agency's position, but OFAC's understanding is also consistent with the testimony of the U.S. Century official deposed in this case, which Plaintiff attempts to rely on in support of its case. *See* Defs. MSJ at 21-22 (U.S. Century official testified that when Plaintiff's wire transfer came in on October 7, 2015, the approximately $105,000 was initially placed into Banco Continental's unblocked account at U.S. Century, and was only later transferred to a blocked account).

Plaintiff also argues that U.S. Century did not "physically transfer" Plaintiff's funds to Banco Continental. Pl. Reply at 3. The Government agrees that these funds were not physically wired to Honduras, but disagrees with Plaintiff's conclusion that "Pacific Solar's funds are at U.S. Century Bank in Miami." *Id*. OFAC is an expert in such correspondent banking transactions and has stated that no steps beyond U.S. Century sending the MT-103 to Banco Continental in Honduras—which notified Banco Continental of the receipt of the funds in its correspondent account at U.S. Century with instructions to credit the account of Plaintiff's

---

its August 3, 2017 decision. Plaintiff contends that it is introducing this evidence to establish its standing, *id*. at 3 n. 1, but the Government does not contest Plaintiff's standing. *See* Defs. MSJ at 3. Accordingly, this court should not consider this testimony and should instead defer to OFAC's determination as to the location of the funds based solely on the MT-103 in the administrative record. *See Citizens to Preserve Overton Park*, 401 U.S. at 420 (in APA challenge, court reviews "the full administrative record that was before the Secretary at the time he made his decision"). In any event, as the Government has shown, even if considered, the extra-record evidence is fully consistent with OFAC's position.

insurance company in Honduras—were required to effectuate the transfer of money from the United States to Honduras. Defs. MSJ at 20-21; Manfull Decl. ¶¶ 42; Addendum to AR at 156 (MT-103 message). The Honduran Government has provided documentation showing a credit to Banco Continental's sundry or general ledger account in Honduras in the amount of 2,312,318.55 in pesos (representing 105,028.05 in dollars) after receiving the MT-103. S*ee* Addendum to AR, ECF No. 45-1 at 22 (Banco Continental's general ledger account). This further demonstrates that Plaintiff's funds were released to Honduras. *See* Defs. MSJ at 23 (citing Manfull Decl. ¶¶ 50-51);

In short, instead of a physical transfer of funds, the correspondent banking transaction contemplated that payment to Plaintiff's Honduran insurance company, Seguros, would be accomplished by means of sending the MT-103, and posting a series of offsetting accounting credits and debits: a credit to the correspondent account of Banco Continental with U.S. Century in Miami, and a corresponding debit to the general ledger account of U.S. Century in Miami; followed by a credit to the general ledger account of Banco Continental in Honduras via the MT-103 instruction, and then, finally, a transfer of these funds via a debit from Banco Continental's general ledger account in Honduras to the credit of Seguros's account in Honduras. *See* Manfull Decl. ¶¶ 31-36; 41, 49-50.

While Banco Continental did not credit Seguros's account because Banco Continental was shut down by the Honduran Government, it remains the case that, given the use of the correspondent banking transaction here, the dollars at U.S. Century in Miami are assets of Banco Continental, *see* Manfull Decl. ¶ 35; *see also* Defs. MSJ at 22, and Plaintiff's funds exist as a credit on Banco Continental's general ledger account in Honduras. *See* Manfull Decl. ¶ 63 (the

Honduran Government has confirmed that Plaintiff's funds are reflected on Banco Continental's accounts in Honduras).

OFAC has expertise in reviewing MT-103 payment orders and the conclusions made in its August 3, 2017 letter regarding the location of the funds are entitled to deference and should be upheld. Under the APA, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. This connection need not be clearly articulated but merely reasonably discernible. *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 286 (1974). OFAC's determination easily satisfies this standard.

Because Plaintiff's funds are located in Honduras, it does not need a license from OFAC to access these funds. Plaintiff may have to bring a claim against Banco Continental in bankruptcy under Honduran law, and it may be one of many creditors pursuing an action against Banco Continental's liquidated estate. *See* Manfull Decl. ¶¶ 52, 63-64. As a consequence, it may receive less than the full value of its wire transfer. This is presumably why it continues to press its claims here, notwithstanding that they are legally deficient. But it remains the case that Plaintiff is likely not without a remedy. At the same time, if Banco Continental's blocked funds at U.S. Century in Miami are ever unfrozen by OFAC, they presumably would be used to pay the many former depositors of Banco Continental that may have priority over Plaintiff's claim under Honduran bankruptcy law.[7] *See* Manfull Decl. ¶¶ 63-64. This shows why an order requiring

---

[7] OFAC communicated with the Honduran Government, which is presiding over Banco Continental's liquidation, in an effort to inquire whether the Honduran Government would agree to a license releasing Banco Continental's funds to Plaintiff. Manfull Decl. ¶ 61. The Honduran Government stated that this would be inconsistent with Honduran law, because the bankruptcy law of the country precludes paying creditors out of order of priority. *Id*. ¶ 63.

OFAC to grant a license would not only be inconsistent with its valid licensing policy, but would have potential foreign policy implications and be inequitable to the many other creditors of Banco Continental's liquidated estate. *Id*. ¶ 64.

In sum, OFAC's conclusion in its August 2017 letter that Plaintiff's funds were made available for payment in Honduras as a result of Banco Continental's receipt of the MT-103 is supported by the administrative record and is not arbitrary and capricious. *See* OFAC's August 3 letter and MT-103, Addendum to AR at 155-156; see also Manfull Decl. ¶¶ 18-19, 64. This determination provides an alternative ground for the Court to uphold the validity of OFAC's denial of Plaintiff's license application.

As noted, however, the Court may grant summary judgment to the Government on Counts I-III of the Complaint based solely on its determination that the Kingpin Act did not require OFAC to grant a license to a foreign business without knowing ties to drug trafficking. *See* Compl., Counts I & III (alleging OFAC's actions are contrary to the Kingpin Act, in violation of the APA); Count II (seeking declaratory judgment to this effect).

**II.     THE GOVERNMENT IS ALSO ENTITLED TO AN AWARD OF SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFF'S DUE PROCESS CLAIM.**

Plaintiff received notice of OFAC's blocking action and had an opportunity to challenge that designation using OFAC's administrative process. While it is unclear whether Plaintiff, as a foreign corporation, has due process rights, if so, the requirements of due process—notice of the decision and a meaningful opportunity to contest it — were satisfied here. *See* Defs. MSJ at 25-26. In its reply, Plaintiff concedes that it did not have a right to notice prior to OFAC's designation and that it did not have a right to a hearing. Pl. Reply at 17. Instead, its argues that, because the Kingpin Act supposedly requires OFAC to grant licenses to businesses without knowing ties to drug trafficking, the Due Process Clause requires OFAC to grant it a license. *Id*.

This is clearly not the case for all the reasons the Government has explained. Accordingly, the Court should award summary judgment to the Government with respect Plaintiff's due process claim in Count IV of the Complaint.

## CONCLUSION

The Court should grant the Government's summary judgment motion, deny Plaintiff's motion, and enter judgment in the Government's favor on all counts in Plaintiff's Complaint. As demonstrated by the administrative record and addendum to the administrative record, OFAC acted reasonably in denying Plaintiff's requested license. In addition, the process OFAC used to do so is lawful and fully consistent with the Kingpin Act.

Dated: May 14, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

DIANE KELLEHER
Assistant Director, Federal Programs Branch

 */s/ Nicholas Cartier*
NICHOLAS CARTIER
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883, Washington, D.C 20044
Telephone: (202) 616-8351
E-mail: nicholas.cartier@usdoj.gov

*Attorneys for Defendants*